UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------------X
UNITED STATES OF AMERICA,

                  - against -

WILLIAM MORILLO,

                         Defendant.
--------------------------------------------------------X

**REPORT AND
RECOMMENDATION**

08 CR 676 (NGG)

On October 3, 2008, defendant William Morillo was indicted and charged with one count of being a felon in possession of a firearm, specifically, a Glock .40 caliber semi-automatic pistol, and ammunition. By Notice of Motion dated January 26, 2009, defendant moved to suppress the handgun and ammunition seized from him at the time of arrest and any statements that he made following his arrest. By Order dated April 2, 2009, the motion to suppress was referred to the undersigned to conduct a hearing and prepare a Report and Recommendation.

For the reasons set forth below, the Court respectfully recommends that the motion to suppress be denied.

FACTUAL BACKGROUND

On April 7, 2009, this Court held a hearing on the defendant's motion to suppress, at which time the government presented the testimony of Sean Patrick Finnegan and Patrick Lancer, officers employed by the New York City Police Department ("NYPD"). The government also called Dr. Philip McPherson from Brookdale Hospital to testify. On July 2, 2009, this Court continued the hearing, at which time the government again presented the testimony of Officer

1

Finnegan, this time about the training that he has received and the practices he employs with respect to inventory searches. (July 2, 2009 Tr.[1] at 2). The defense presented the testimony of Philip Martin, an investigator with the Federal Defenders of the Eastern District of New York and former Officer of the NYPD. The defense also called the defendant, William Morillo.

Officer Finnegan testified that he had been employed by the NYPD as a Police Officer for over two years, assigned to the 75th Precinct. (Apr. 7, 2009 Tr.[2] at 10). In September 2008, Officer Finnegan and his partner, Patrick Lancer, were assigned to the Patrol Unit for the 75th Precinct, responsible for responding to radio runs, enforcing the law, and addressing quality of life infractions, such as people riding bicycles on the sidewalk, drinking alcohol in public, and urinating in public. (Id. at 11, 59). According to the officers, they were not always assigned to cover the same area in Brooklyn; rather, patrol assignments were handed out at roll call every morning. (Id. at 11, 59, 62).

On September 2, 2008, Officer Finnegan and Officer Lancer were assigned to patrol the northwest part of the 75th Precinct. (Id. at 12, 62). Officer Finnegan testified that he and Officer Lancer, who was driving the marked police car, began their patrol at 1000 Sutter Avenue between Essex and Linwood Streets, proceeding north toward Atlantic Avenue. (Id. at 13).

At approximately 9:30 to 10:00 a.m., Officer Finnegan noticed the defendant riding a silver and black, very shiny bicycle on the sidewalk of Atlantic Avenue, traveling westbound on

---

[1]Citations to "July 2, 2009 Tr. at " refer to pages in the transcript of proceedings held before this Court on July 2, 2009.

[2]Citations to "Apr. 7, 2009 Tr. at " refer to pages in the transcript of proceedings held before this Court on April 7, 2009. The suppression hearing continued on May 27, 2009 and July 2, 2009, due to the need for the parties to conduct additional discovery and address new Supreme Court case law.

the south side of the avenue. (Id. at 13-14, 15; Gvt. Exs.[3] 1A, 1B). At the time the officer first saw the defendant, he was approaching Ashford Street, wearing a backpack. (Id. at 14). The officers proceeded to make a u-turn onto the south side of traffic, activating their lights and sirens to stop the defendant. (Id. at 15). After getting the defendant's attention, Officer Finnegan asked him for identification, to which the defendant responded by asking "what he had done wrong." (Id. at 16). Officer Finnegan told him that it was a violation to ride his bicycle on the sidewalk in New York City and asked him a second time for his identification. (Id.) At that point, the defendant, who was straddling his bike and standing above the seat, again asked what he had done wrong. (Id.) When Officer Finnegan attempted to exit the police car to speak with the defendant, he took off on his bicycle around the back passenger side of the police vehicle and rode westbound across all lanes of traffic on Atlantic Avenue until he reached the far right westbound lane. (Id. at 16-17). At that point, the officers made a second u-turn onto the westbound side of traffic to pursue the defendant. (Id. at 17).

After both the defendant and the officers had crossed the median in the middle of Atlantic Avenue and the officers' car was in the same lane as the defendant, approximately three quarters of a block away, Officer Finnegan saw the defendant turn his head and look back at the officers. (Id.) According to Officer Finnegan, the defendant was approaching Atlantic Avenue and Warwick Street as he looked back, and "he apparently hit what appeared to be a pothole or a bump. The front end of the [bike] went over and he proceeded head [first] over [the] handle bars." (Id. at 17-18). According to Officer Finnegan, the area in which the defendant fell "has

---

[3]Citations to "Gvt. Ex." refer to exhibits entered into evidence by the government during the suppression hearing.

potholes, it is bumpy and very uneven." (Id.) The officer denied hitting the defendant with the police car at any time. (Id.)

After the defendant fell off his bike, the officers moved over to the center lane and pulled around the defendant, cutting off his westbound flight in the far right lane. (Id. at 18-19). When the police car stopped, Officer Finnegan exited the vehicle first and attempted to apprehend the defendant. (Id. at 19). According to the officer, as he went to grab the defendant, the defendant pushed the officer and fled eastbound on foot across all lanes of traffic. (Id.) Officer Finnegan and his partner chased the defendant, and Officer Finnegan grabbed at his backpack, which had a "type of nesting [sic] on the back of it, like a nylon material." (Id.; Gvt. Ex. 2).

When asked if the defendant appeared to be hurt, Officer Finnegan testified that he was "noticeably limping," and that he had a "bump on the top of his head." (Id. at 20-21). Eventually, the officers caught up to the defendant. As they grabbed him, "he began flailing his arms, kicking, shifting his weight downward trying to prevent us from being able to apprehend him." (Id. at 21). Officer Finnegan grasped defendant's left arm, applied pressure to his left wrist and elbow, eventually causing all three men to fall to the ground. (Id.) In the process, Officer Finnegan suffered an injury to his left arm and pain and bruising to his left leg. (Id. at 22; Gvt. Ex. 3). The officer conceded that he used force, but he asserted that it was the minimum amount of force necessary to effect the arrest. (Id. at 23).

After the defendant was on the ground, Officer Finnegan brought the defendant's left hand around, while Officer Lancer placed him in handcuffs. (Id. at 23). The officers then walked the defendant onto the concrete median that separates east and westbound traffic. (Id.) However, when Officer Finnegan stood up, he realized that his radio had fallen into the

4

westbound lanes of traffic, so he went to retrieve it as Officer Lancer held the defendant. (Id. at 24). After retrieving his radio, Officer Finnegan rejoined his partner and together they walked the defendant back to the police car. (Id.) At that time, Officer Lancer conducted a search of defendant's person while Officer Finnegan searched defendant's backpack. (Id.) In the backpack, he recovered a Glock handgun and a pair of work gloves. (Id.) The officers then radioed their supervisor and transported the defendant back to the precinct. (Id.)

Officer Finnegan testified that he had patrolled the area of Atlantic Avenue six times or more and had witnessed criminal activity in that area before the defendant's arrest. (Id. at 30). He also testified that he had stopped people before for riding their bicycles on the sidewalk on approximately six occasions. (Id. at 31). Sometimes these people were issued a summons; at other times, they were arrested. (Id. at 39, 40). He admitted that this was the first gun arrest that he had made. (Id. at 44).

On cross-examination, Officer Finnegan testified that upon arrival at the 75th Precinct, the officers called for emergency medical services because the defendant was injured. (Id. at 33). The defendant was then taken directly to the hospital. (Id.) The officer acknowledged observing a large lump on the defendant's head after he flipped over his bicycle, and that he later learned that the defendant had fractured his collarbone. (Id. at 32-33; Def.'s Ex.[4] A). The officer also testified that he could not recall if he had removed the defendant's backpack from the defendant's back or if he had found it somewhere else. (Id. at 44). Although he did not recall where the backpack was, he testified that it was not very far from where the defendant was

---

[4]Citations to "Def.'s Ex." refer to exhibits entered into evidence by the defendant during the suppression hearing.

arrested to the police car. (Id. at 55, 57). When asked whether he mentioned in the arrest report that the defendant had run away, Officer Finnegan explained that he mentioned that the defendant had resisted arrest. (Id. at 46; Gvt. Ex. 3500-SF-2; Gvt. Ex. 3500-SF-3). He testified that he provided information to the District Attorney's Office, but he could not be sure whether he told the Assistant District Attorney ("ADA") that the defendant ran across the street; he did, however, indicate that he had "always stated that the defendant did attempt to run away from us - - upon approach, after he pushed me." (Id. at 47). In explaining why he did not include certain details in the complaint forms, Officer Finnegan stated that it is his job to describe in a "short narrative" the circumstances leading up to the charges, and he knew when he signed the form that it did not contain all of the details of the events. (Id. at 50-51). He subsequently provided a more detailed description to the United States Attorney's Office and in an application for departmental recognition. (Id. at 52; Gvt. Ex. 3500-SF-11).

Patrick Lancer testified that he had been a police officer with the NYPD for over three years. (Id. at 59). He confirmed his partner's testimony that on September 2, 2008, they were assigned to patrol a specific sector within the 75th Precinct in Brooklyn, looking to enforce quality of life issues, including riding bicycles on the sidewalk. (Id. at 59, 62). He conceded that prior to that time, he had been placed on probation. (Id. at 60). In July 2008, he requested a transfer from transit to patrol, where he remained until January 2009. (Id. at 60-61). At that time, he was placed on modified assignment and transferred to the Queens Court section. (Id. at 60). According to the officer, these transfers were not related to any complaints of excessive force, nor to anything related to this instant case; rather, he received a poor evaluation from his supervisor for being excessively late to work. (Id. at 61).

6

According to Officer Lancer, he and his partner were on patrol in the vicinity of Ashford and Cleveland Streets at approximately 9:30 a.m., when they saw the defendant riding his bicycle on the sidewalk. (Id. at 63). At that time, the officers were driving westbound on the north side of Atlantic Avenue. (Id.) The defendant was also riding westbound, but he was on the south side of Atlantic Avenue riding in the opposite direction to the traffic. (Id. at 62-64). Officer Lancer turned the emergency vehicle lights on, made a u-turn over the median, and pulled the defendant over. (Id. at 64). The defendant came up to the passenger side of the car and was asked for identification. (Id.) The defendant refused to provide identification, asking the officers what he had done. (Id.) According to Officer Lancer, Officer Finnegan then told the defendant that he was riding his bicycle on the sidewalk and was going to get a summons. (Id.) The defendant continued to refuse to produce identification, so Officer Finnegan started to get out of the police car. (Id.) At that time, the defendant rode away on his bike, so Officer Finnegan never fully got out of the car. (Id.)

As the defendant began to ride his bicycle across Atlantic Avenue, Officer Lancer turned the car around to pursue him. (Id. at 65). After the defendant crossed the median, he turned around to look back at the officers, hit a pothole, went head first over the handle bars of his bicycle, and landed on the ground. (Id. at 65-66). During this time, his backpack was on his back. (Id.) When he fell off his bike, he was approximately three to four car lengths from the officers' car. (Id. at 66). Officer Lancer also denied that the police car struck the defendant's bike. (Id. at 66, 67).

After the defendant fell over the handle bars, the officers pulled up alongside the defendant and got out of the car. (Id. at 66). The defendant then got up and began to run away.

7

(Id.) When Officer Lancer came around from the driver's side of the car, he saw Officer Finnegan in a sitting position on the ground and the defendant running across Atlantic Avenue. (Id. at 67). According to Officer Lancer, the defendant appeared to be limping a bit as he ran. (Id. at 69).

Officer Lancer then pursued the defendant, catching up to him on the opposite side of Atlantic Avenue in the middle lane. (Id. at 67). According to Officer Lancer, the defendant continued to resist, flailing his arms. (Id.) At that point, Officer Finnegan arrived, and together the officers put him on the ground to cuff him. (Id.) Officer Lancer testified that because the defendant was still fighting as they were trying to put the handcuffs on, Officer Lancer scooped defendant's legs from underneath him. (Id.) They all fell to the ground, with the officers falling on top of the defendant. (Id.) According to Officer Lancer, it is possible that the defendant injured his shoulder when the officers fell on top of him. (Id. at 69). He testified that he never took out his gun; instead, the officers cuffed the defendant, and Officer Lancer grabbed the defendant's backpack, walked him back to vehicle, placed the backpack on the trunk, and began to search the defendant. (Id. at 68). Officer Finnegan then began to search the defendant's backpack, where he found a loaded firearm. (Id.)

On cross-examination, Officer Lancer admitted that often the officers do not issue a summons to people riding their bicycles on the sidewalk; sometimes they just warn them. (Id. at 78). On this occasion, the officers decided to issue the defendant a summons when he refused to produce identification. (Id.) The officer further testified that the backpack came off the defendant during the struggle to cuff him, and he recovered the pack from the road in the immediate area where the defendant was placed in handcuffs. (Id. at 81). He further testified

8

that Officer Finnegan is about six feet, eight inches tall and weighs about 280 pounds. (Id. at 82).

Dr. Philip McPherson testified that he was on duty at Brookdale Hospital, where he treated Mr. Morillo for his injuries on September 2, 2008. (Id. at 89). According to the doctor, Mr. Morillo told him that he was riding away from the police when he fell off the bicycle. (Id. at 89-90). The doctor testified that at the time the defendant made this statement he did not have any trouble explaining things, nor did he seem disoriented or report any loss of consciousness. (Id. at 90). He did complain of pain, and had limited arm movement on the right side of his body. (Id. at 96). However, he did not mention getting hit by a car. (Id. at 90). According to the doctor's examination, the defendant had a hematoma on the right side of his head, various abrasions on his head and right elbow, tenderness over his right shoulder, and a swelling and tenderness over his right clavicle. (Id.) Based on an x-ray examination, the doctor found that defendant had also suffered a fractured clavicle. (Id. at 96; Def.'s Ex. D). On cross examination, in response to a question from defendant's counsel regarding whether the doctor needed to review the paperwork in order to recall the conversation with the defendant, the doctor replied: "Not really. You know why? Because I struck a conversation with him: How are you going to run away from the police? How far do you think you can go. So, me and Mr. . . Morillo, we had a conversation. . . .I remember the conversation that I had with him when he was in Brookdale Hospital." (Id. at 100-01).

The government recalled Officer Finnegan to the witness stand on July 2, 2009, to address certain questions relating to police policy on conducting inventory searches. He testified that during his six months of training at the police academy, he received training on criminal and

procedural law, police procedure, and physical training. (Id. at 2). Following graduation from the police academy, he received further training for approximately a year and a half at the Field Training Unit at the 75th Precinct, where senior officers and training officers instructed him as he became acclimated to work in the field. (Id. at 5).

Among other things, the officer received training about the procedures to be followed in executing searches, including inventory searches. (Id. at 2-3). He testified that the purposes of inventory searches are "for my safety, the safety of my partner, and the officers around me . . . [the safety of] the prisoner himself as well as the general public . . . [and] to safeguard all property that was found on the defendant at the time of his arrest." (Id. at 5). Officer Finnegan further testified that at the police academy, he received a Patrol Guide and training with respect to the provision of the Patrol Guide that states: "property that is not inventoried from an automobile but is possessed or under the control of an arrested individual and all items found therein may be vouchered as the prisoner's property." (Id. at 6-7; Gvt. Ex. 5). With regard to this provision, Officer Finnegan testified that he was taught that "there's a difference between a closed item and a locked item and also that even if an item is locked, if it can be opened with minimal damage, that you can do so. Only if you cannot open it without causing minimal damage would you need to acquire a search warrant." (Id. at 7). Based on this training, Officer Finnegan's general practice with respect to performing an inventory search is "[a]t the time someone is taken into custody, their person as well as anything in their possession at the time of their arrest will be searched through and then vouchered accordingly." (Id. at 8).

Officer Finnegan testified that he had made 85 arrests since he became a police officer, and, to the best of his recollection, he has never made an arrest and not performed an inventory

10

search. (Id.) According to the officer, a preliminary search can be conducted right after the person is taken into custody, and then a more thorough search will be conducted again back at the stationhouse. (Id.) Examples of areas the officer looks during his inventory searches include a person's pockets, wallets, and backpacks. (Id.)

According to Officer Finnegan, he did not search the backpack that the defendant was wearing until after the defendant was taken into custody. (Id. at 9-10). He testified that there are no circumstances under which he would have waited until he was back at the precinct to search defendant's backpack, "'cause I need to know what's - - what's in that backpack and also what's going in my car as I transport him back to the station house." (Id. at 10). Officer Finnegan again stated that this was necessary for the safety of himself, his partner, the prisoner, and the people around, and so that the officers have an accurate account of what is going to be taken and vouchered during the arrest process. (Id. at 10-11). Officer Finnegan testified that under no circumstances would he have left the backpack in the street and that once the backpack got back to the precinct, it would be searched one more time to be thorough and then the contents would be vouchered. (Id. at 11).

On cross-examination, Officer Finnegan conceded that when he filled out the arrest report in this case on the day of the arrest, he classified his search of Mr. Morillo's backpack as a "S.I.L.A.," or a search incident to lawful arrest, not as an inventory search. (Id. at 13; Gvt. Ex. 3500-SF-3). He also indicated that he did not take any notes at the scene of the arrest and that it took him a few hours to complete the arrest reports and property invoices back at the precinct. (Id. at 11-12, 14). Officer Finnegan also testified that when someone is arrested on the street, it's possible to give a defendant's personal property to a friend who is present if that's authorized by

the defendant. (Id. at 16). However, while it's possible to call a friend or family member who is not on the scene to pick up a defendant's property, "you're supposed to . . . take all items into custody and voucher them accordingly for safeguarding or arrest evidence." (Id.) The officer further indicated that even though he did not make a record of the items he took back to the precinct until he filled out property invoices at the precinct, there was no need to do so in this case because he retained possession of all of defendant's property until he vouchered it. (Id. at 17).

The defense also questioned Officer Finnegan about the circumstances under which an officer could issue a desk appearance ticket. Officer Finnegan testified that whenever someone is taken into custody, that person is brought to the stationhouse and considered for a desk appearance ticket. (Id. at 23, 27). A desk appearance ticket cannot be issued in the field. (Id. at 23). According to Officer Finnegan, the officer would do an inventory search before taking any person into the patrol car, regardless of whether that person would ultimately be processed or simply get a desk appearance ticket. (Id. at 24). However, if a person is issued a desk appearance ticket, he would be given a court date to appear for whatever charges are brought, and any property that was not connected to the arrest would be returned to him and not be vouchered. (Id. at 22). Officer Finnegan testified that defendant Morillo was not eligible for a desk appearance ticket, because he had an active bench warrant for his arrest[5] and had no identification on him. (Id. at 21-22, 26). The officer reiterated that the policy of the police

---

[5]At the time of the hearing on July 2, 2009, the government had not produced the bench warrant to the defendant. (Id. at 28). However, on July 15, 2009, the government submitted a letter indicating that it had supplemented its earlier disclosures and produced the warrant to defendant. The warrant itself is not in evidence for purposes of this proceeding.

department is to search all belongings once a prisoner is taken into custody. (Id. at 25).

The defense presented Philip Martin as an expert on police practice and procedure. (Id. at 34). Mr. Martin testified that he has been an investigator with the Federal Defenders for seven years, and he had previously been an officer for the NYPD for 20 years, from 1981 to 2001. (Id. at 32-33). In addition to his training at the police academy, where he received training about police procedures and the Patrol Guide, he also took a variety of refresher courses throughout his career at the NYPD. (Id. at 33-34). He testified that in the 20 years he was at the NYPD, he made approximately 200 arrests, and he was present or assisted in approximately 400 arrests. (Id. at 34).

Mr. Martin testified that when someone is arrested, that person's property could either be taken into police custody as evidence or for safekeeping, or the property could be given to a friend or family member of the person arrested without performing a complete inventory of the contents of the property. (Id. at 34-35). He testified that even if an additional person is not on the scene at the time the person is arrested, the property could still be given to a friend or family member back at the precinct without being fully inventoried or searched. (Id. at 35-36). Rather, if the property was given to a friend or family member, the officer would not search the contents of the bag unless the officer thought that the contents would be evidence of the crime for which the person was arrested. (Id. at 36). Mr. Martin also testified that if a person was given a desk appearance ticket at the precinct, an inventory search would not necessarily be performed on the bag if the officer had no reason to believe there was evidence of the crime or anything that could be harmful in the bag. (Id. at 37). Finally, Mr. Martin testified that often when prisoners resisted arrest, they were not ultimately charged and booked with resisting arrest, and sometimes they just

13

got issued a desk appearance ticket. (Id. at 38).

On cross-examination, Mr. Martin acknowledged that he has had no training with the police department since he retired in 2001. (Id. at 39). However, on redirect, he testified that the Patrol Guide pages on invoicing property, which were admitted into evidence as Defendant's Exhibit 5, are consistent with his understanding of the policies that were in place when he was a police officer. (Id. at 44; Def.'s Ex. 5). On cross-examination, he also conceded that there are certain circumstances under which it would be necessary for an officer to perform an inventory search to ensure the safety of the officers and others. (Id. at 41). He conceded that if someone is charged with resisting arrest, it would be appropriate to perform an inventory search of his person and what he is carrying. (Id. at 41-42).

Finally, the defense called the defendant, William Morillo, who testified to the circumstances surrounding his arrest and the search of his backpack. He is 34 years old and currently working at the NSA Supermarket on Lafayette and Marcus Garvey in Brooklyn, performing security and deliveries. (Id. at 47). On September 2, 2008, he was working at J&P Grocery on Fulton and Highland in a similar position, performing tasks such as inventory, stock, and making sandwiches. (Id. at 47-48).

Mr. Morillo testified that on September 2, 2008, he was riding his bicycle on Ashford and Atlantic Avenues, when he rode onto the sidewalk to cut across to the other side of Atlantic, going west toward Warwick. (Id. at 48-49; Def.'s Ex. I). According to defendant, when he got onto the sidewalk, a police car, traveling in the opposite direction, pulled up next to him. (Id. at 49). Defendant testified that when the police officers initially pulled up alongside him, their sirens and lights were not on. (Id. at 50). One of the officers said something, but defendant did

14

not hear what he said, so defendant rode up to the door by the police car. (Id. at 49). Defendant testified that at that point, one of the officers told him, "'Get the 'eff' off the sidewalk.'" (Id.) Defendant said okay, and he proceeded to ride behind the police car and continued to cross Atlantic. (Id. at 49-50). According to defendant, when he rode away on his bicycle, he was not trying to escape from the officers. (Id. at 50).

Defendant further testified that after he rode behind the police car, he stopped, looked for traffic, rolled to the median, and stopped again to look for traffic. (Id.) At that point, the officers started to make a u-turn. (Id.) Defendant then recounted the following: "As I was crossing the median, I didn't get too far; and then it was like all of a sudden it was like, boom, I'm on the floor, you know. I can't recall exactly how I was there. It was just one minute I'm just - - I'm on the floor." (Id. at 51). Defendant testified that he did not see a pothole. (Id.)

When defendant hit the asphalt, he felt "severe, severe pain," focused on the whole right side of his body. (Id. at 51-52). His right arm "just automatically was, like, down," and he felt severe pain in his shoulder. (Id. at 52). Defendant testified that he might have blacked out because he hit his head, and he "wasn't functioning right." (Id. at 51-52). From the moment he hit the floor, the next thing he remembers is one of the officers picking him up and placing him on the hood of the car. (Id. at 52). According to defendant, when he was placed on the hood of the car, neither officer told him he was under arrest, handcuffed him, or suggested that he was going to get a summons. (Id. at 53).

Defendant testified that when he was placed on the hood of the car, his right arm was in so much pain that he could not move it, so he could not have flailed his arms. (Id. at 53-54). He further testified that when he was placed on the hood, he did not have his backpack on; one of the

15

officers retrieved the backpack from wherever it was and came from behind defendant with the backpack. (Id. at 55). Officer Finnegan then opened the backpack and found the gun, and then the officers placed the handcuffs on defendant. (Id.)

According to defendant, after he was arrested and taken to the precinct, he was taken to Brookdale Hospital, where his head, shoulder, elbow, hand, and ankle were treated. (Id. at 56-57). He was diagnosed with a broken collarbone and given pain medications that affected his ability to think clearly. (Id. at 57). He acknowledged that he briefly talked to the doctors, but he said that he was being taken care of by an Asian doctor and spoke mostly with him. (Id.) On cross-examination, defendant clarified that the Asian doctor he was referring to is not Dr. McPherson; he remembers Dr. McPherson conferring about his care with the Asian doctor, who was his primary doctor, but he does not remember speaking to Dr. McPherson. (Id. at 83).

On cross-examination, defendant admitted that he was somewhat nervous during his verbal exchange with the police because he knew he could get in trouble for having a gun in his backpack, given that he had previously been convicted of possessing a gun and of a robbery that was alleged to involve a gun. (Id. at 72-73). He acknowledged that the transcript from his interview with the Internal Affairs Bureau ("IAB") on the day of the arrest indicates that he told the interviewer, "I took off on my bike," that he was "running," and that he thought, "oh man, it's not gonna be good." (Id. at 75, 84, 86). However, he indicated that his IAB interview occurred immediately after he returned from the hospital when he was "severely medicated and still in pain." (Id. at 82). Finally, defendant conceded that he "can't say for certain" that he was hit by a police car. (Id. at 84).

DISCUSSION

Defendant moves to suppress the gun on two separate grounds: (1) that the officers'

arrest of defendant violated the Fourth Amendment because the arrest and manner of arrest were

not "reasonable" in light of defendant's perceived offense; and (2) that even if the arrest of

defendant and its execution were reasonable within the meaning of the Fourth Amendment, the

officers had no grounds to search defendant's closed backpack. (Def.'s Mem.[6] at 1). As part of

his argument that the officers had no grounds to search the closed backpack, defendant argues

that under Arizona v. Gant this was not a lawful search incident to arrest and that the gun would

not have been inevitably discovered as part of a lawful inventory search.


I. Affidavit Requirement

After defendant's original submission of his motion to suppress but prior to the

commencement of the April 7, 2009 hearing, the government argued that Mr. Morillo's motion

should be denied without a hearing because the motion was defective. (Gvt. Mem.[7] at 7). The

government argued that since defendant is required to present a factual dispute to be entitled to a

hearing and defendant did not submit an affidavit containing specific factual allegations of which

he has first-hand knowledge, defendant's motion was defective and should be denied without a

hearing.

---

[6]Citations to "Def.'s Mem." refer to the Memorandum of Law in Support of William
Morillo's Motion to Suppress, dated January 26, 2009. The Court notes that the motion papers
contain a typographical error in that the Memorandum actually bears the date January 26, 2008.

[7]Citations to "Gvt. Mem." refer to the Government's Memorandum of Law in Opposition
to the Defendant's Motion to Suppress, dated February 17, 2009.

17

It is well-established law in this Circuit that a defendant does not have an absolute right to an evidentiary hearing on a motion to suppress. Where the defendant has failed to submit an affidavit based upon personal knowledge, there is no factual issue properly before the court and a motion to suppress evidence should be denied. See United States v. Ahmad, 992 F. Supp. 682, 685 (S.D.N.Y. 1998); see also United States v. Gillette, 383 F.2d 843, 848 (2d Cir. 1967). Indeed, "a defendant is not entitled to an evidentiary hearing on a motion to suppress evidence absent the submission of an affidavit based on personal knowledge setting forth facts necessary to make out a prima facie case that the evidence was obtained in violation of the defendant's rights." United States v. Defede, 7 F. Supp. 2d 390, 394 (S.D.N.Y. 1998).

However, after the government's contention that defendant's motion was defective because he did not include an affidavit, defendant submitted an affirmation on March 5, 2009, which essentially presented two factual disputes to be resolved during a hearing: (1) that he did not fall off his bicycle by hitting a pothole, and (2) that he was placed under arrest only after the police officers searched his backpack. (Def. Aff.[8] at 2). Accordingly, since defendant submitted an affirmation containing specific factual allegations of which he has first-hand knowledge, the Court accepted his affirmation and proceeded to a hearing.

---

[8]Citations to "Def. Aff." refer to the Affirmation of William Morillo, submitted in support of his motion to suppress on March 5, 2009.

## II. Arrest of Defendant

Defendant argues that the officers' seizure of him and the manner in which they executed his arrest was "unreasonable" and a violation of the Fourth Amendment. (Def.'s Mem. at 1 (citing United States v. Jacobsen, 466 U.S. 109 (1984); United States v. Alverez-Tejeda, 491 F.3d 1012 (9th Cir. 2007)). Although defendant concedes that NYPD officers are authorized to make arrests for riding a bicycle on the sidewalk in violation of Section 19-176(c) of the New York City Administrative Code, see United States v. McFadden, 238 F.3d 198 (2d Cir. 2001), defendant contends that the officers here were angry because he was not cooperative and, therefore, they used their vehicle to hit defendant and his bike. (Def.'s Mem. at 2).

New York law permits a police officer to arrest someone without a warrant for committing a "petty offense," N.Y. Crim. Pro. Law §§ 140.10(1)(a), 140.10(2) (McKinney's 1992), including, among other things, traffic infractions.[9] Id. § 1.20(39). In United States v. McFadden, 238 F.3d 198 (2d Cir. 2001), the Second Circuit held that a violation of Section 19-176(b) of the New York Administrative Code, which prohibits "rid[ing] a bicycle on a sidewalk unless permitted by an official sign," constitutes a "traffic infraction." Accordingly, police officers who observe the commission of such an infraction have probable cause to effectuate an arrest of that individual. Id. at 204 (citing United States v. Cruz, 834 F.2d 47, 50 (2d Cir. 1987)).

In this case, the officers testified credibly that they initially observed the defendant riding his bicycle on the sidewalk.[10] At that point, the officers had probable cause to arrest him for a

---

[9]Officers also have the discretion to issue a summons for traffic infractions. N.Y. Veh. & Traf. Law §§ 225(1) and 226(1) (McKinney's 1996).

[10]Indeed, defendant corroborated the officers' testimony when he testified that he rode his bike onto the sidewalk. (July 2, 2009 Tr. at 48).

19

traffic infraction. Even though they were initially going to issue him a summons or just give him a warning, when the defendant failed to produce identification and rode away on his bicycle, the officers were justified in pursuing him and making the determination then that they would arrest him.

In support of the claim that the officers were unreasonable in how they effected the arrest, defendant points to a number of allegedly inconsistent statements made by the officers regarding the events leading to the arrest. First, defendant argues that the officers' version of events suggesting that Mr. Morillo resisted arrest, "flailing his arms" and attempting to punch the officers, is contradicted by the medical evidence. According to defendant, the medical reports make clear that it would have been impossible for defendant to flail his arms given the undisputed evidence that he suffered a fractured clavicle, and it was unreasonable for the officers to have handcuffed him given his fractured collarbone. (Def.'s Mem. at 2-3; July 2, 2009 Tr. at 54). Instead, defendant argues in his brief that "[w]hat does make sense" is that the officers used their vehicle to strike Mr. Morillo on his bike. (Def.'s Mem. at 2). Indeed, defendant argues that he reported this to the EMS worker who transported him to the hospital immediately after the incident. (Id.)

However, the Court credits the officers' testimony that defendant was fleeing from the officers when he rode away across Atlantic Avenue and resisted the officers when they tried to arrest him. Defendant admitted during his testimony to being nervous about talking to the officers, knowing that he could get in trouble for carrying a gun. He also admitted during his

IAB interview that he was "running" from the officers,[11] and the undisputed evidence is that defendant looked back toward the officers as he rode away. Although defendant claims that it would have been impossible for him to resist arrest because he had a broken clavicle, both officers credibly testified that it is possible that the defendant injured his shoulder after he resisted, when the officers were able to contain him and fell on top of him.

Furthermore, the Court finds that there is no credible evidence in the record to support the assertion that the officers tried to stop the defendant by striking him with their vehicle. When asked, both of the officers denied that they struck the defendant with their vehicle and this Court, having observed their demeanor on the stand, finds them credible. In addition, the government offered into evidence a photograph of the bicycle ridden by the defendant which shows a shiny, almost new looking bicycle with no visible scratches or dents that might suggest that the bike had been struck by another vehicle as alleged by defendant. Further, defendant's own testimony in court, which was consistent with what he told the IAB interviewer, was that he did not recall how he fell from his bicycle to the ground.

Although defendant relies on a statement in the EMS report to argue that he reported being struck by the police car, the language of the report does not support that claim, but rather indicates that he reported being hit in the head by the officer and falling to the ground striking his

---

[11]The Court notes that the pictures taken of defendant around the time of his IAB interview clearly show that he looked drowsy, and the Court credits defendant's testimony that he was medicated and in pain during his interview. (See Def.'s Ex. C). However, while defendant testified that he was severely medicated during the interview and, as a result, may not have given detailed descriptions, he never testified that he was not truthful during the IAB interview. Furthermore, despite defendant's testimony to the contrary, the Court finds that there is no way to interpret defendant's statements that he "took off on [his] bike" and was "running" other than to mean that he was fleeing.

right shoulder. Not only is that report consistent with the officers' version of events and the injuries incurred by defendant, but also the emergency room physician who treated defendant testified that defendant told him that he was riding his bicycle away from the police when he fell off the bicycle. (Id. at 89-90). The doctor, whose testimony was highly credible, testified that at no time did the defendant mention getting hit by a car. The doctor further stated that at the time the defendant made this statement, the defendant did not have any trouble explaining things, nor did he seem disoriented or report any loss of consciousness. (Id. at 90).

Given defendant's actions in fleeing from the officers across four lanes of traffic and continuing to flee after falling head first off of his bike, coupled with his actions in resisting the officers' efforts to restrain him, the Court finds that the amount of force used in the arrest was not unreasonable under the circumstances. See Scott v. Harris, 550 U.S. 372 (2007) (holding that an officer's use of force in the course of effecting an arrest was not unreasonable ); Sheikh v. City of New York, Police Dep't., Nos. 03 CV 6326, 05 CV 4718, 2008 WL 5146645, at *14 (E.D.N.Y. Dec. 5, 2008) ("under New York law, a police officer may use physical force when and to the extent he or she reasonably believes necessary to effect the arrest of a person whom he or she reasonably believes to have committed an offense") (citing N.Y. Penal Law § 35.30(1) (McKinney 2007)). However, even if the Court were to credit defendant's assertion that he was not fleeing, given that the officers clearly had probable cause to arrest defendant for riding his bicycle on the sidewalk, the Court would still find that the officers used no more physical force than they reasonably believed was necessary to effect the arrest.

Accordingly, the Court finds no basis on which to conclude that the officers acted unreasonably in using the amount of force that was used to arrest the defendant; nor is there any

22

evidence to support his claim that they struck him with the police vehicle.

## III. Search of Backpack

Defendant contends that if even Mr. Morillo was lawfully seized, the officers had no authority to search defendant's backpack once he had been apprehended and placed in handcuffs. (Def.'s Mem. at 3). As part of his argument that the officers had no grounds to search the closed backpack, defendant contends that under the Supreme Court's recent decision in Arizona v. Gant, this was not a lawful search incident to arrest and, therefore, the gun seized from defendant's backpack should be suppressed. Defendant argues further that the gun would not have been inevitably discovered as part of a lawful inventory search. (Def.'s May 6, 2009 Ltr. Br.[12] at 1; Def.'s July 22, 2009 Ltr. Br.[13] at 1).

In response, the government relies on the rationale advanced in Chimel v. California, 395 U.S. 752, 763 (1969), to argue that following a lawful arrest, police officers may perform a contemporaneous search of the area within the "immediate control" of the defendant to ensure that the defendant cannot gain access to a weapon. (Gvt. Mem. at 14). The government argues that the Supreme Court's decision in Arizona v. Gant, limiting the circumstances in which officers may conduct a search incident to arrest, does not apply to this case and, regardless, that the police would inevitably have searched the backpack as part of a lawful inventory search.

---

[12]Citations to "Def.'s May 6, 2009 Ltr. Br." refer to defendant's letter brief, submitted on May 6, 2009.

[13]Citations to "Def.'s July 22, 2009 Ltr. Br." refer to defendant's letter brief, submitted on July 22, 2009.

(Gvt. May 13, 2009 Ltr. Br.[14] at 2-3).

A. Search Incident to Lawful Arrest

In <u>California v. Chimel</u>, the Supreme Court held that "police may search incident to arrest only the space within an arrestee's 'immediate control,' meaning 'the area from within which he might gain possession of a weapon or destructible evidence.'" <u>Arizona v. Gant</u>, 129 S. Ct. 1710, 1716, 173 L. Ed. 2d 485 (2009) (citing <u>Chimel v. California</u>, 395 U.S. at 763)). This is because the exception to the warrant requirement that allows an officer to perform a search incident to a lawful arrest stems from "interests in officer safety and evidence preservation that are typically implicated in arrest situations." <u>Id.</u> at 1716 (citing <u>United States v. Robinson</u>, 414 U.S. 218, 230-234 (1973)). Courts since <u>Chimel</u> have upheld the validity of searches incident to arrest in a variety of situations, even where the item searched has been out of defendants' reach or defendants have been handcuffed. <u>See, e.g.</u>, <u>United States v. Nelson</u>, 102 F.3d 1344, 1347 (4th Cir. 1996) (allowing search of defendant's shoulder bag after agents had removed it from his body and taken defendant to another room for questioning); <u>United States v. Hernandez</u>, 941 F.2d 133, 135-37 (2d Cir. 1991) (allowing search between the mattress and box spring of a bed after suspects were handcuffed); <u>United States v. Fleming</u>, 677 F.2d 602, 607 (7th Cir. 1982) (allowing search of paper bags seized and searched after the defendants were handcuffed and placed under arrest). <u>See also</u> <u>New York v. Belton</u>, 453 U.S. 454, 462-63 (1981) (allowing search of automobile following a traffic stop).

In the recent decision of <u>Arizona v. Gant</u>, the Court revisited the parameters for a search

---

[14]Citations to "Gvt. May 13, 2009 Ltr. Br." refer to the government's letter brief, submitted on May 13, 2009.

incident to a lawful arrest in the context of an automobile stop, holding that <u>Belton</u> does not authorize a vehicle search incident to the arrest of an occupant once the arrestee has been secured and cannot access the interior of the vehicle. 129 S. Ct. at 1714. Accordingly, the Court in <u>Gant</u> concluded that "[i]f there is no possibility that an arrestee could reach into the area that law enforcement officers seek to search, both justifications for the search-incident-to arrest exception [officer safety and evidence preservation] are absent and the rule does not apply." <u>Id.</u> at 1716. In order to clarify that <u>Belton</u> did not create a police entitlement to search a vehicle incident to arrest, the Court stated that the "<u>Chimel</u> rationale authorizes police to search a vehicle incident to a recent occupant's arrest only when the arrestee is unsecured and within reaching distance of the passenger compartment at the time of the search." <u>Id.</u> at 1719.

Although <u>Gant</u> dealt with the limited circumstance of searches incident to arrest in the context of an automobile search, the rationale of the majority opinion would seem to apply in this case, where the defendant had been secured, his backpack had been seized by the police, and he could not have reached the backpack that was searched. Indeed, Justice Alito's dissent recognizes that the majority's decision "leaves the law relating to searches incident to arrest in a confused and unstable state," noting that although the opinion relates only to vehicle occupants, "there is no logical reason why the same rule should not apply to all arrestees." <u>Id.</u> at 1731.

The government argues that this case is distinguishable from <u>Gant</u>, because the defendant in <u>Gant</u> was handcuffed *and* locked in a patrol car, so it was unreasonable to believe that he could access the contents of his car, whereas the defendant here was only handcuffed and had attempted to flee, so it was reasonable to believe that he could possibly have reached his backpack. (Gvt. May 13, 2009 Ltr. Br. at 2 (citing <u>United States v. Parra</u>, 2 F.3d 1058, 1066

(10th Cir. 1993); <u>United States v. Lucas</u>, 989 F.2d 606, 610 (8th Cir. 1990)). The government further argues that this case is distinguishable from <u>Gant</u> because the object to be searched in <u>Gant</u> was a car that would not be transported along with the defendant to the precinct, whereas the object to be searched in this case was a backpack that the officers had to transport in their police car. Thus, the officers had to ensure that it did not contain something that could injure the handler. (<u>Id.</u> at 3 (citing cases)).

While this case is a closer call than <u>Gant</u>, because this defendant was not yet locked in the squad car, the Court finds that there was no reasonable possibility that the defendant could have gained access to the backpack. Both officers credibly testified that the defendant had been handcuffed and placed up against the back passenger side of the police car, while they conducted a search of his backpack at the rear of the vehicle. (Apr. 7, 2009 Tr. at 23-24, 68, 81). Given that the defendant had been secured by two much larger officers and had a broken collarbone and no mobility in his right arm, and that the backpack was out of his reach and had been secured by the officers, he could not reasonably have gained access to the backpack. While <u>Gant</u> does not invalidate all searches where a defendant is handcuffed, in this case the defendant and the backpack were completely secured. Furthermore, as in <u>Gant</u>, there is no basis to believe that there was any evidence contained in his backpack that would relate to the traffic infraction of riding a bicycle on the sidewalk. Thus, the concern relating to evidence preservation would not have justified a search under these circumstances.

However, in this case, the officers had an additional concern, which was not at issue and not addressed in <u>Gant</u>, that this Court concludes justified the search incident to arrest at issue. This case is distinguishable from <u>Gant</u> in that the object to be searched in <u>Gant</u> was a car that

26

would not be transported along with the defendant to the precinct, whereas the object to be searched in this case was the defendant's backpack that the officers had to transport in their police car. Thus, there was a reasonable risk to the officers that they were transporting something in their vehicle that could injure the handler, such as a dangerous weapon or contraband. See Donkers v. Camargo, No. 07 CR 11220, 2008 WL 2795960, at *4 (E.D. Mich. July 18, 2008) (holding that where the suspect's purse would be brought with her to the police station, it was appropriate to search it incident to arrest to ensure that it did not contain any dangerous weapons). Particularly given that defendant refused to produce identification, fled from the officers following a stop for an extremely minor infraction, and then resisted arrest even after injuring himself in the fall, the officers had reason to suspect that the defendant had something to hide. It was reasonable for them to be concerned that he may have had something in his bag that was dangerous or that, at the very least, he did not want the officers to see. While the officers could have kept the backpack out of the defendant's reach by securing it in the trunk, for their safety and the safety of the defendant, the officers were justified in ensuring that nothing in the backpack could harm them while they were handling the backpack or during the car ride to the precinct. Accordingly, the Court finds that there was a concern relating to officer security here that justified a search of the backpack and distinguishes this case from Arizona v. Gant.

B. Inventory Search

The government argues that regardless of whether the decision in Gant authorizes a warrantless search incident to arrest under the circumstances of this case, the gun would have been discovered as part of a routine inventory search and therefore should not be suppressed. (Gvt. July 22, 2009 Ltr. Br. at 6). Defendant, however, responds that the government: (1) has

27

not established that the gun would have inevitably been discovered as part of a lawful inventory search, and (2) cannot transform Officer Finnegan's on-the-scene search of the backpack into a lawful inventory search. (Def.'s July 22, 2009 Ltr. Br. at 2).

Following an arrest for which there is probable cause, police officers are permitted to impound a defendant's personal effects and perform an inventory search of the defendant's belongings. See United States v. Perea, 986 F.2d 633, 643 (2d Cir. 1993). The Supreme Court has repeatedly held that reasonable inventory searches are an exception from the warrant requirement, which serve "to protect an owner's property while it is in the custody of the police, to insure against claims of lost, stolen, or vandalized property, and to guard the police from danger." Colorado v. Bertine, 479 U.S. 367, 372 (1983). See also Illinois v. Lafayette, 462 U.S. 640, 643 (1983); South Dakota v. Opperman, 428 U.S. 364, 382-83 (1976). The touchstone for a reasonable inventory search is whether the search was conducted "in good faith pursuant to standardized criteria or established routine." United States v. Thompson, 29 F.3d 62, 65 (2d Cir. 1994) (internal citations omitted). See also United States v. Mendez, 315 F.3d 132, 137 (2d Cir. 2002). The inventory procedures need not be in writing, see id., and they need not be the least intrusive alternative. See Colorado v. Bertine, 479 U.S. at 374. However, as the defendant points out, even if an inventory search would have been reasonable, the government must prove that it would have been inevitable in this particular case. United States v. Gorski, 852 F.2d 692, 696 (2d Cir. 1988) (finding that an inventory search was not inevitable because a "thorough review of the record reveals no evidence that such searches were an invariable, routine procedure in the booking and detention of a suspect at the particular FBI office involved").

Pointing to the language in NYPD Patrol Guide governing the inventory search in this

case, as well as the testimony of Officer Finnegan and Mr. Martin, defendant argues that the decision to inventory property here was discretionary. NYPD Patrol Guide Procedure No. 218-13 states: "Property that is not inventoried from an automobile but is possessed or under the control of an arrested individual, *may* be inventoried and all items found therein *may* be vouchered as prisoner's property." (Gvt. Ex. 5 (emphasis added)).

The evidence here shows that the officers had probable cause to arrest the defendant for riding a bike on the sidewalk, so they were permitted to conduct an inventory search without a warrant. Furthermore, despite the fact that the word "may" appears in the Patrol Guide and could imply that an inventory search is discretionary, Officer Finnegan clearly testified that his regular practice, as well as the policy of the NYPD, is to perform an inventory search subsequent to every arrest. (July 2, 2009 Tr. at 7-8, 25). Officer Finnegan testified that to the best of his recollection, he has never made an arrest where he has not performed an inventory search. (Id.) He testified that a preliminary search can be conducted right after the person is taken into custody, and then a more thorough search will be conducted again back at the stationhouse. (Id.) The Court credits the officer's testimony and finds that he conducted the search "in good faith pursuant to standardized criteria or established routine." See United States v. Thompson, 29 F.3d at 65 (internal citations omitted).

While defendant argues that Officer Finnegan and Mr. Martin agreed that it was possible to turn over property to a third party without taking it into police custody, in this case, defendant had no friend or family member at the scene and, therefore, the officers had no choice but to take the backpack to the precinct. Moreover, Officer Finnegan testified that even if someone had been present, his practice is to perform an inventory search before returning any property to a

29

defendant or a third party, because it is necessary to know exactly what property is being returned. (July 2, 2009 Tr. at 16-17, 18). Mr. Martin's testimony does not cast doubt on Officer Finnegan's testimony that he would have inevitably conducted an inventory search of the backpack, nor does it suggest that Officer's Finnegan's practice of conducting inventory searches was improper or unauthorized. To the contrary, Mr. Martin acknowledged that there are certain circumstances under which it would be necessary for an officer to perform an inventory search to ensure the safety of the officers and others, and that such a search would be appropriate where someone is charged with resisting arrest. (Id. at 41-42).

Defendant also argues that Officer Finnegan, who called his search of Mr. Morillo's backpack a search incident to lawful arrest on the arrest report, cannot transform his on-the-scene search of the backpack into a lawful inventory search. (Id. at 13; Gvt. Ex. 3500-SF-3). Defendant cites Illinois v. Lafayette to argue that an inventory search must be conducted in the stationhouse. (Def.'s Ltr. Br. at 3 (citing Illinois v. Lafayette, 462 U.S. at 646, 648)). However, while Lafayette discusses the different rationales that justify a search incident to arrest and a stationhouse inventory search, it does not hold that all inventory searches must be conducted in the stationhouse. Furthermore, it is irrelevant whether Officer Finnegan characterized his initial search of the backpack as a search incident to a lawful arrest or as an inventory search. Regardless, it is clear from his testimony that he would not have made the arrest and transported the backpack or given it to a third party without searching it, and, in any event, he would have found the gun during the inventory search he performed at the precinct.

Accordingly, the Court finds that the officers would inevitably have discovered the weapon upon arrival at the precinct even if they had secured the backpack without searching it at

the scene of the arrest. (Id. at 11, 29-30). See United States v. Wyche, 307 F. Supp. 2d 453, 461 (E.D.N.Y. 2004) (holding that it was inevitable that weapons in the defendant's duffel bag would have been discovered in an inventory search). The defendant was placed under arrest and handcuffed prior to the discovery of the weapon, and the officers had already determined that they were going to transport him to the precinct for processing. Upon arrival at the precinct, he was held for a period of time, and during this time, the police would have confiscated defendant's backpack and conducted an inventory of its contents for their own safety and that of others in their custody.

Accordingly, regardless of whether the Supreme Court intends to extend the rationale of Gant to searches incident to arrest in contexts other than vehicle searches, the Court concludes that it is inevitable that the officers would have discovered the weapon upon the completion of an inventory search.

## CONCLUSION

Given that Mr. Morillo's arrest was lawful, that the search of the backpack can be justified as a search incident to lawful arrest, and that, regardless, the gun would have inevitably been discovered as part of an inventory search, this Court respectfully recommends that Mr. Morillo's motion to suppress be denied.

Any objections to this Report and Recommendation must be filed with the Clerk of the Court, with a copy to the undersigned, within ten (10) days of receipt of this Report. Failure to file objections within the specified time waives the right to appeal the District Court's order. See 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(e), 72; Small v. Secretary of Health and Human Servs., 892 F.2d 15, 16 (2d Cir. 1989).

The Clerk is directed to mail copies of this Report and Recommendation to the parties.

**SO ORDERED.**

Dated: Brooklyn, New York
August 12, 2009

Cheryl L. Pollak
United States Magistrate Judge
Eastern District of New York