```
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X
    UNITED STATES OF AMERICA                              MEMORANDUM & ORDER

                    -against-                             08 CR 676 (NGG)

    WILLIAM MORILLO


                            Defendant.
-------------------------------------------------------------------X
```
NICHOLAS G. GARAUFIS, United States District Judge.

Before the court is a Report and Recommendation ((ABBR: "R & R") (Docket Entry # 66)) issued by Magistrate Judge Cheryl L. Pollak recommending that Defendant's Motion to Suppress be denied. (Defendant's Motion to Suppress (Docket Entry # 20).) Defendant filed objections (Objection to Report and Recommendations (Docket Entry #69)) and the Government has filed its response to Defendant's objections (Docket Entry #70). Defendant's motion is denied.

**I.  STANDARD OF REVIEW**

Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure, the district court must conduct a de novo review of those portions of the R & R to which the parties have objected. The district court may not reject a proposed finding of a magistrate judge that rests on a credibility finding, however, without personally hearing live testimony from the witnesses whose testimony is determinative. Carrion v. Smith, 549 F.3d 583, 590 (2d Cir. 2008); Cullen v. United States, 194 F.3d 401, 407 (2d Cir. 1999).

Portions of the R & R to which the parties have not objected are reviewed for clear error. See Urena v. New York, 160 F. Supp. 2d 606, 609-10 (S.D.N.Y. 2001). "Where a party makes only conclusory or general objections, the court reviews the report and recommendation for clear

1

error." United Stated v. Lake, 244 F. Supp. 2d 104, 107 (E.D.N.Y. 2003) (internal quotation marks omitted). But the court "may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b)(1)(C).

## II.  DISCUSSION

The court presumes familiarity with the underlying facts set forth in Judge Pollak's R & R and only briefly summarizes them here. (See generally, R & R 1-16.) Between 9:30 and 10:00 a.m. on September 2, 2008, Defendant William Morillo ("Defendant" or "Morillo") was riding his bicycle on a Brooklyn sidewalk. He was wearing a backpack at the time. Police Officers Patrick Lancer and Patrick Finnegan stopped Morillo for illegally riding his bicycle on the sidewalk, an arrestable offense in New York City. During a short exchange, while the officers remained in their vehicle, they asked Morillo for identification; and Morillo asked the officers why they stopped him. The officers told Morillo that it is a violation to ride a bicycle on a New York City sidewalk. Morillo did not present identification to the officers.

As one officer began exiting the police car, Morillo fled on his bicycle, and the officers pursued him in their vehicle. Before long Morillo hit a pothole and crashed his bicycle. Morillo then abandoned his bicycle and continued fleeing on foot. The officers eventually tackled and arrested Morillo, who resisted arrest. During the struggle Morillo's backpack came off. The officers then handcuffed Morillo and brought him and his backpack to their police car. Officer Lancer searched Morillo's person against the back passenger side of the police car while Officer Finnegan, who is six feet eight inches tall and weighs 280 pounds, searched Morillo's backpack at the rear of the police car. The officers found a loaded handgun and pair of work gloves in Morillo's backpack.

Defendant seeks to suppress the gun that officers seized from him and statements he made to the police on the day of his arrest. Morillo contends that the seizure of the gun in his backpack violated his Fourth Amendment rights in two separate ways: (i) the manner in which arresting officers arrested him for riding a bicycle on the sidewalk was unreasonable; and (ii) even if the arrest and its execution were reasonable, the arresting officers had no grounds to search his closed backpack. (See Defendant's Memorandum of Law in Support William Morillo's Motion to Suppress (Docket Entry # 20) ("Def. Mem.") 1.)

On Morillo's first ground for suppression, Judge Pollak determined that the arresting officers were justified in initially pursuing Morillo and eventually arresting him, and that in arresting Morillo the officers did not use an unreasonable amount of force under the circumstances. (R & R 19-20, 22.)

On Morillo's second ground for suppression, Judge Pollak determined that the arresting officers had two alternative grounds to search Morillo's backpack. In light of Arizona v. Gant, – U.S. –, 129 S. Ct. 1710 (2009), Judge Pollak found that there was no reasonable possibility that Defendant could have accessed his backpack justifying a search incident to arrest. Nevertheless she found that there was a concern relating to officer security that distinguishes this case from Gant and justified the search of Morillo's backpack as a search incident to arrest. (R & R 26-27.) Judge Pollak reasoned that because the arresting officers had to transport the backpack in their police car, "there was a reasonable risk to the officers that they were transporting something in their vehicle that could injure the handler," justifying a search of the backpack for anything that "could harm them while they were handling the backpack or during the car ride to the precinct." (R & R 27.) In the alternative, Judge Pollak determined that the arresting officers properly conducted a preliminary inventory search of Morillo's backpack at the scene of the arrest

3

pursuant to standardized criteria or established routine. (R & R 29.) Finally, Judge Pollak found that the arresting officers would inevitably have discovered the weapon during an inventory search at the precinct even if the officers had secured the backpack without searching it at the scene of the arrest. (R & R 30-31.)

Defendant specifically objects to the conclusion that the officer's search was a lawful search incident to arrest in light of <u>Gant</u>'s reasoning.[1] Defendant reiterates the arguments in his post-hearing brief, objecting to the conclusion that the on-scene search constituted a "preliminary" inventory search or that the gun would have been inevitably discovered through a lawful inventory search at the police stationhouse. (<u>See</u> Defendant's Post Suppression Hearing Letter (Docket Entry #64).)

This court adopts in part and modifies in part the Magistrate Judge's recommendation. The court adopts the recommendation that Morillo's arrest and manner of arrest did not violate Morillo's Fourth Amendment rights. Regarding the search of Morillo's backpack, the court concludes that the search was not a valid search incident to arrest. But the gun is nonetheless, admissible because it would inevitably have been discovered during a valid inventory search and because the arresting officers were justified in investigating potentially dangerous instrumentalities prior to transporting them in their police car. Accordingly, the court accepts and modifies the Magistrate Judge's recommendation to deny Morillo's suppression motion on the grounds set forth below.

---

[1] In his objections to Judge Pollak's R & R Defendant generally objects "to each and every factual finding and each and every legal conclusion" in Judge Pollak's R & R. (<u>See</u> Objection to Report and Recommendations 1). This is a general and conclusory objection which, by itself, only triggers a clearly erroneous standard of review.

A.    **Search Incident to Arrest**

A search incident to arrest is a well-settled exception to the Fourth Amendment's warrant requirement. Chimel v. California, 395 U.S. 752, 763 (1969). This exception authorizes police to search the "arrestee's person and the area within his [or her] immediate control," which is "the area from within which he [or she] might gain possession of a weapon or destructible evidence." Id. Concerns for police officer safety and evidence preservation justify the exception because a search incident to arrest may reveal weapons that an arrestee may use to resist arrest or effect escape or may reveal evidence that an arrestee may conceal or destroy. See id. at 763.

Searches incident to arrest can be performed regardless of whether police officers have probable cause to believe that an arrestee may actually have a weapon or evidence that he or she may destroy. United States v. Robinson, 414 U.S. 218, 235 (1973). "[T]here is always some danger that the person arrested may seek to use a weapon, or that evidence may be concealed or destroyed." United States v. Chadwick, 433 U.S. 1, 14 (1977). But when a search is remote in time or place from an arrest the two justifications are absent and cannot justify a search as incident to arrest. Chimel, 395 U.S. at 764.

When a search cannot be justified as incident to a lawful arrest, the Fourth Amendment does not permit warrantless searches of luggage or other property seized at the time of an arrest. Rules governing the searches of closed containers determine the validity of warrantless searches of containers such as backpacks. See Chadwick, 433 U.S. at 15 (holding that a search at a police station, more than one hour after the arrest, is not justified as incident to arrest), overruled on other grounds by California v. Acevedo, 500 U.S. 565, 575-79 (1991). Variations in a container size and whether a container is locked are immaterial. See Arkansas v. Sanders, 442 U.S. 753, 762 n.9, overruled on other grounds by Acevedo, 500 U.S. at 575-79.

5

In Chadwick the Supreme Court stated that "[o]nce law enforcement officers have reduced luggage or other personal property not immediately associated with the person of the arrestee to their exclusive control, and there is no longer any danger that the arrestee might gain access to the property to seize a weapon or destroy evidence, a search of that property is no longer an incident of the arrest." 433 U.S. at 15. Thus "when no exigency is shown to support the need for an immediate search, the Warrant Clause places the line at the point where the property to be searched comes under the exclusive dominion of police authority." Id.

Chadwick's "exclusive control" test was later undermined by the Supreme Court's opinion in New York v. Belton, 453 U.S. 454 (1981). Belton held that a search of a suspect's jacket on the backseat of his car was valid as an incident to his arrest, even though the officer had already removed the suspect from the vehicle before conducting the search. Stating that its holding only determined the meaning of Chimel's principles in the context of automobile searches incident to arrest, the Court held that "when a policeman has made a lawful custodial arrest of the occupant of an automobile, he may, as a contemporaneous incident of that arrest, search the passenger compartment of that automobile," including closed containers found in the passenger compartment. Belton, 453 U.S. at 460. Belton expressly rejected the argument that the search at issue was not incident to arrest "because [the officer], by the very act of searching the respondent's jacket and seizing the contents of its pocket, had gained 'exclusive control' of them." Id. at 462 n.5. The Court reasoned that "under this fallacious theory no search or seizure incident to a lawful custodial arrest would ever be valid; by seizing an article even on the arrestee's person, an officer may be said to have reduced that article to his 'exclusive control.'" Id.

In Arizona v. Gant, the Supreme Court reexamined the scope of permissible vehicle searches incident to the arrest of recent vehicle occupants that courts have interpreted to be authorized by Belton and its progeny. 129 S.Ct. at 1719. In Gant, police officers arrested the defendant for driving without a license. The five police officers who searched the defendant's car outnumbered the three arrestees, who were handcuffed and secured in separate patrol cars. "Because police could not reasonably have believed either that [the defendant] could have accessed his car at the time of the search or that evidence of the offense for which he was arrested might have been found therein," the Court held that "the search was unreasonable." Id. The Court thus reaffirmed that a search incident to arrest is limited by its two justifications—officer safety and evidence preservation—and that "the Chimel rationale authorizes police to search a vehicle incident to a recent occupant's arrest only when the arrestee is unsecured and within reaching distance of the passenger compartment at the time of the search." Id. "If there is no possibility that an arrestee could reach into the area that law enforcement officers seek to search, both justifications for the search-incident-to-arrest exception are absent and the rule does not apply." Id. at 1716.

1. Second Circuit Authority

Outside of the automobile context, the Second Circuit has never expanded the scope of a search incident to arrest beyond its two justifications. It has not followed other courts and commentators in applying Belton's rationale to authorize searches of personal baggage that are out of an arrestee's reach at the time of the search.[2]

---

[2] For example, in a 1984 en banc decision, the Fourth Circuit upheld a search of a suspect's shoulderbag after the police took the bag away from the suspect. United States v. Litman, 739 F.2d 137, 139 (4th Cir. 1984) (en banc). The district court had held that although the shoulderbag was within reaching distance of the suspect at the time of his arrest, the warrantless search could not be justified under Chimel once the shoulderbag was within the officer's exclusive control. The Fourth Circuit reversed, holding that since Belton rejected Chimel's exclusive control test, the shoulderbag search was valid because "[t]he seizure of the shoulderbag was contemporaneous with the defendant's arrest and frisk and search followed instantly." Id. 739 F.2d at 139; see United States v. Han, 74 F.3d

7

For example, the defendant in United States v. Lartey, 716 F.2d 955 (2d Cir. 1983), claimed that a search of his briefcase was not authorized as a search incident to his arrest. According to the defendant's facts, DEA agents seized his briefcase while he was handcuffed. The agents later searched the briefcase at DEA headquarters without a warrant. Addressing these facts the Second Circuit stated that "the search was conducted not as an immediate search at the time and place of arrest, but as a pre-incarceration search after [the defendant] was arrested and when his briefcase was under the exclusive control of the agents. There was no danger under such circumstances that evidence would be destroyed or that harm would come to the agents. Absent these exigencies, there is no justification under Chadwick for a warrantless search as incident to a lawful arrest." Id. at 966.

Similarly, in United States v. Gorksi, 852 F.2d 692 (2d Cir. 1988), FBI agents arrested two individuals for drug-related offenses. During their arrest, one agent took a black vinyl bag from the defendant and set it on the ground to one side as the suspects were handcuffed and frisked in the presence of several agents who had their guns drawn. Immediately thereafter, one agent searched the black bag and found the contested evidence. Before the search the defendants could not access the bag: "[t]here was neither a risk of a defendant getting to a weapon in the bag nor a risk of a defendant destroying or absconding with evidence from the bag." Id. at 695.

The defendant in Gorksi moved to suppress, inter alia, the evidence found from the search of the black bag, claiming that the search was not incident to his arrest, not compelled by exigent circumstances, and not pursuant to an inventory search. Id. at 694. Because "the facts at

---

537, 542 (4th Cir. 1996) ("[I]t is well-settled that officers may separate the suspect from the container to be searched, thereby alleviating their safety concerns, before they conduct the search."); 3 Wayne R. LaFave, Search and Seizure: A Treatise on the Fourth Amendment § 5.5(a) (4th ed. 2004) ("Belton does not purport to be a wholesale revision of the Chimel rule. . . . This does not mean, however, that Belton has adopted a search-incident-to-arrest rule for containers in vehicles which is not applicable with equal force to containers in vehicles but possessed by an arrestee.").

8

the time of the search suggest[ed] no exigency in the form of a risk of either harm to the agents or loss of evidence," the Second Circuit ruled that the search was not authorized as a search incident to arrest, even though the FBI agents presumably acted on security concerns. Id. at 695 (emphasis added). The Court of Appeals further held that exigent circumstances did not justify the search "since the bag was inaccessible to the suspected drug dealers and there was not the slightest danger that the luggage or its contents could have been removed before a valid search could be obtained." Id. (internal quotation marks and alterations omitted). The case was remanded to determine whether the contested evidence is nonetheless admissible because it would inevitably have been discovered at a later inventory search. Id. at 696.

The Second Circuit's standard in Gorksi for searching a defendant's baggage incident to arrest is not undermined by the Supreme Court's holding in Gant. It is grounded in the same search incident to arrest limitations that the Supreme Court applied in Gant. In the context of a pedestrian arrest the Gorski test asks whether an exigency in the form of either a risk of harm to the arresting officers or a risk to evidence exists because an arrestee can reasonably access a piece of luggage at the time of the search.

      2.   <u>Application of the Second Circuit's Search Incident to Arrest Standard</u>

Under the Gorski standard for a search incident to an arrest, the search of Morillo's backpack was not valid. This court agrees with the Magistrate Judge that "there was no reasonable possibility" that Morillo could have gained access to his backpack because (i) the backpack was out of Morillo's reach while he was handcuffed, (ii) Morillo and the backpack were secured by police officers of much larger size, (iii) and, Morrillo had a broken collarbone and no mobility in his right arm. (See R & R 26.) The officers had no reason to think that evidence of a crime was in Morillo's backpack. And because the officers arrested Morillo for

9

illegally riding his bicycle on the sidewalk there could be no evidence of that specific crime in his backpack. It follows that neither the interests in officer safety nor evidence preservation were implicated.

### B. Exigent Circumstances

The Fourth Amendment's requirement that officers first obtain a warrant before searching a suspect's luggage recognizes an exception for exigent circumstances. See Chadwick, 433 U.S. at 15. "The test to determine whether exigent circumstances exist "is an objective one that turns on . . . the totality of the circumstances confronting law enforcement agents in the particular case." Id. In this case the question is whether exigent circumstances could justify the immediate search of Morillo's bag at scene of the arrest. Finding exigent circumstances is a fact-intensive inquiry and each case is decided on its own facts. Even so, the following cases illustrate how the exigent circumstances doctrine applies to warrantless searches of luggage or other closed containers.

In United States v. Johnson, 467 F.2d 630 (2d Cir. 1972), a reliable informant told police, who were investigating a robbery, that one of two suitcases in a "transient and high crime area" contained a sawed-off shotgun used in the robbery. Upon finding the suitcases, police officers immediately opened them and discovered a loaded sawed-off shotgun. The Court of Appeals held that the "exigencies of the situation" justified an immediate and warrantless search of the suitcases. Because the officers had probable cause to believe that one suitcase contained a contraband sawed-off shotgun as they stood in a transient and high crime area, the Court of Appeals reasoned that the safety of the officers and others "required that [the officers] know whether they were holding a dangerous weapon over which they had no control." Id. at 639. The Court of Appeals further stated that

10

> Under these circumstances, we cannot hold that the police were required to carry the suitcase, unopened, to the police station to obtain a warrant or that an officer should have stood near or held the unopened suitcase as a warrant was obtained. The police were entitled to know what they were holding in their possession. The suitcase containing the shotgun and its contents were properly admitted.

Id.

In United States v. Wyche, 307 F. Supp. 2d 453 (E.D.N.Y. 2004) (Platt, J.), police received a tip that the defendant was staying in a motel and was trying to sell a handgun in a motel hallway. Later, the defendant's co-occupant in the motel room told police that he had a gun, different from the defendant's gun, hidden under a mattress in the room. The police, therefore, knew that at least one more gun, other than the co-occupant's gun, was in the room. Pursuant to the co-occupant's consent to "go up to the room and get the gun," the police recovered the co-occupant's gun, arrested the defendant, and found a third suspect in the motel room. In further searching the room the police found and searched—without a warrant—a closed duffel bag and discovered several other firearms. Judge Platt held that "[o]nce the police discovered the [gun] secreted within the motel room, a room where one suspect was present, where the officers had reasonable suspicion that at least one other firearm . . . was present but not yet discovered, exigent circumstances existed." Id. at 460. "These circumstances permitted the police to conduct a warrantless search of Wyche's bag to secure the weapons contained therein and to ensure the safety of themselves and the public." Id.

By contrast, a police officer's reasonable belief that dangerous contraband is in a container does not, by itself, create an exigency justifying a warrantless search of that container. See United States v. Atkinson, 653 F. Supp. 668, 677 (S.D.N.Y. 1987) (Leisure, J.). That is "mere existence of a weapon, without evidence of, or reasonable belief in, an imminent threat posed by [a] weapon does not justify a warrantless intrusion under the exigency test." Id.; see

11

United States v. Martin, 562 F.2d 673,679-80 (D.C. Cir. 1977) (Bazelon, C.J.) (holding that probable cause to believe that a machine gun was in a carrying case did not justify a warrantless search).

These cases collectively show that exigent circumstances justify a warrantless search of a closed container only when the police have reason to believe a container is concealing a dangerous instrumentality and that the hidden danger poses an imminent threat to either the arresting officers or the surrounding public.[3]

Applying this principle to the circumstances surrounding Morillo's arrest, exigent circumstances cannot justify the warrantless search of Morillo's backpack. Because Morillo fled from the police, and resisted arrest after failing to provide identification in response to the minor offense of riding a bicycle on a sidewalk, Officers Lancer and Finnegan had reason to believe that Morillo may have been hiding a dangerous instrumentality in his backpack. But the officers did not have further reason to think that such potentially dangerous instrumentality in Morillo's backpack posed an imminent threat to the officers or members of the public. Morillo was secured and the officers had control over his backpack.

### C. Special Exigencies

Just because Officers Lancer and Finnegan were not faced with exigent circumstances, it does not follow that they must carry a potentially dangerous backpack in their police car, without either affirming or dispelling their suspicion. Even without exigent circumstances, "[t]here may be cases in which the special exigencies of the situation would justify the warrantless search of a

---

[3] Of course, "[w]here law enforcement authorities have probable cause to believe that a container holds contraband or evidence of a crime, but have not secured a warrant, the [Supreme] Court has interpreted the [Fourth] Amendment to permit seizure of the property, pending issuance of a warrant to examine its contents, if the exigencies of the circumstances demand it or some other recognized exception to the warrant requirement is present." United States v. Martin, 157 F.3d 46 (2d Cir. 1998).

12

suitcase." Arkansas v. Sanders, 442 U.S. 753, 763 n.11. The Supreme Court in Chadwick noted that "there may be other justifications for a warrantless search of luggage taken from a suspect at the time of his arrest; for example, if officers have reason to believe that luggage contains some immediately dangerous instrumentality, such as explosives, it would be foolhardy to transport it to the station house without opening the luggage and disarming the weapon." 433 U.S. at 15 n.9 (citing Johnson, 467 F.2d at 639).

The circumstances of this case fit squarely into this justification for conducting a warrantless search of luggage. Morillo's furtive and evasive behavior gave the officers reason to believe he was hiding something potentially dangerous in his backpack at the time of his arrest. Officer Finnegan testified that "I need to know what's - - what's in that backpack and also what's going in my car as I transport it to the stationhouse." (July 2, 2009 Tr. 10-11.) According to Officer Finnegan, this was necessary for the safety of himself, his partner, the prisoner and the people around. (See R & R 11.)

Based on the information that they knew at the time of Morillo's arrest, Officers Lancer and Finnegan had reason to believe that Morillo was hiding a dangerous instrumentality in his backpack. Morillo had fled on his bicycle, continued fleeing on foot after crashing his bicycle, and then resisted arrest. This was in response to the officers' request for identification and their statement that the stop was directed at Morillo riding his bicycle on the sidewalk. Morillo's disproportionate response—attempting to avoid potential liability for violating the New York City Administrative Code by exposing himself to further criminal liability during the course of his failed get-away—properly gave the officers reason to suspect that Morillo fled and resisted arrest because he did not want a greater wrong uncovered.

13

Because police officers, in this age of terrorist-related threats, are on their guard for suspicious packages and furtive behavior in public places, Officers Lancer and Finnegan reasonably could have thought that Morillo was fleeing from a potential search of his own backpack. The circumstances in this case, therefore, justified the officers' steps to affirm their suspicions by opening Morillo's backpack before transporting it in their police car.

### D. Inevitable Discovery in an Inventory Search

While the gun is admissible under the special exigency identified in Chadwick, the gun is also admissible because the arresting officers would have inevitably found it during a later inventory search of Morillo's backpack at the stationhouse.[4] The inevitable discovery exception to the exclusionary rule and the inventory exception to the warrant requirement are two different legal doctrines. They each have their own independent legal standards. But the two doctrines may be combined admit evidence under a theory of inevitable discovery in an inventory search.

1. Inventory Searches

Police inventory searches constitute a well-defined exception to the Fourth Amendment's warrant requirement. Illinois v. Lafayette, 462 U.S. 640, 643 (1983). "[A]rresting officers may impound the personal effects" found on or in possession of a lawfully arrested person to ensure the safety of those effects or to remove nuisances from the area." United States v. Perea, 986 F.2d 633, 643 (2d Cir. 1993) (internal quotation marks omitted). Police may properly remove and inventory this property when the arrested person is to be jailed. Lafayette, 462 U.S. at 646. Inventory searches are usually conducted at police stations, but the Fourth Amendment does not

---

[4] Gant did not consider whether evidence illegally obtained under a purported search incident to arrest may nonetheless be admissible pursuant to the inevitable discovery during a valid inventory search. The Arizona Supreme Court had found that the officers "had no intention of impounding Gant's car until after they searched the passenger compartment and found the contraband." State v. Gant, 162 P.3d 640, 646 (Ariz. 2007), aff'd Gant, 129 S.Ct. at 1720.

14

require that they be conducted at any particular location.  See United States v. Mendez, 315 F.3d 132, 137 n.3 (2002).

Under the inventory search exception "law enforcement officials may open closed containers as part of an inventory search so long as they act in good faith pursuant to standardized criteria or established routine." Mendez, 315 F.3d at 137 (internal quotation marks and alterations omitted). "The existence of such a valid procedure may be proven by reference to either written rules and regulations or testimony regarding standard practices." Id.  Fruits of an inventory search conducted in "bad-faith or solely for the purpose of investigation" will be suppressed.  United States v. Thompson, 29 F.3d 62, 65 (2d Cir. 1994).

2. Inevitable Discovery

"Under the inevitable discovery doctrine, evidence that was illegally obtained will not be suppressed if the government can prove that the evidence would have been obtained inevitably even if there had been no statutory or constitutional violation." Mendez, 315 F.3d at 137; see Nix v. Williams, 467 U.S. 431, 447 (1984).  To admit contested evidence, the Government must "establish by a preponderance of the evidence that the information ultimately or inevitably would have been discovered by lawful means." Nix, 467 U.S. at 444.  But the inevitable discovery doctrine only applies if the court finds "with a high level of confidence, that each of the contingencies necessary to the legal discovery of the contested evidence would be resolved in the government's favor." United States v. Heath, 455 F.3d 52, 60 (2d Cir. 2006).  It is not enough that there is a "reasonable probability that the contested evidence would have been discovered by lawful means in the absence of police misconduct." See id.

3. Inevitable Discovery in an Inventory Search

The inevitable discovery doctrine has been combined with the inventory search exception to admit unlawfully obtained evidence if the contested evidence "would nonetheless have been discovered in the course of a valid inventory search." Mendez, 315 F.3d at 137. To admit contested evidence under a theory of inevitable discovery in an inventory search the Government must prove "(1) that the police had legitimate custody of the vehicle or property being searched, so that an inventory search would have been justified; (2) that when the police in the police agency in question conducted inventory searches, they did so pursuant to established or standardized procedures; and (3) that those inventory procedures would have inevitably led to the discovery of the challenged evidence." Id. at 138 (internal quotation marks and citations omitted); see Gorski, 852 F.2d at 696 (remanding for an evidentiary hearing to determine whether an inventory search of the bag was a routine procedure at the FBI office in question).

The Government has met its burden in this case. First, the police had legitimate custody of Morillo's backpack. When a person is lawfully arrested in a place other than in his or her home, police officers "may impound the personal effects that are with him at the time to ensure the safety of those effects or to remove nuisances from the area." Perea, 986 F.2d at 643 (internal quotation marks omitted). Because the officers in this case lawfully arrested Morillo on the street and outside of his home, they had legitimate custody over the backpack that he was carrying.

Second, police department guidelines and the testimonies of Officers Lancer and Finnegan show that the officers follow inventory search procedures that are established and standardized at their particular stationhouse. New York City Police Department guidelines governing inventory search procedures state that,

> Property that is not inventoried from an automobile but is possessed or under the
> control of an arrested individual, may be inventoried and all items found therein

16

may be vouchered as prisoner's property. If a locked container such as a brief case or safe is inventoried, it should not be forced open if to do so would cause more than minimal damage. . . .

(See N.Y.P.D. Patrol Guide Procedure No. 218-13 (Suppression Hearing Gov't Ex. 5) ("Inventory Search Guidelines") 2.) The Magistrate Judge found that Officer Finnegan credibly testified that both New York City Police Department policy, and his own regular practice, developed over the course of 85 career arrests, is to perform an inventory search after every arrest of anything in a suspect's possession at the time of his or her arrest. (See R & R 29; July 2, 2009 Tr. 7-8, 25.) Although the Inventory Search Guidelines are phrased in permissive language, Officer Finnegan's testimony that he has invariably inventoried items in an arrestee's possession during his career sufficiently establishes that the procedures are followed and are standard.

Officer Finnegan, and a former New York City Police officer who was a witness for the defense, both testified that when a person is arrested it is possible to turn over property to a third party without first taking it into police custody. (R & R 29.) Officer Finnegan further testified that it is also possible to call an arrestee's family member to the stationhouse to pick up seized property. (See July 2, 2009 Tr. 16-17.) But if a third party is present, Officer Finnegan testified that his practice is to perform an inventory search before returning any property to a third party because it is necessary to know exactly what property is being returned. (R & R 28-29.) And when a family member comes to the stationhouse, Officer Finnegan indicated that it is his practice to first voucher property turned over. In either event any seized items are inventoried under the same procedures.

These possibilities do not undermine Officer Finnegan's testimony establishing that the purported inventory search policies are in fact "standard." A standardized policy "is required so

17

that inventory searches do not become a ruse for general rummaging in order to discover incriminating evidence." See United States v. Lopez, 547 F.3d 364, 369-71 (2d Cir. 2009) (upholding a vehicle inventory search policy as standardized when the arresting officers' testimonies that it is the responsibility of the officer to conduct an inventory search of an impounded car to see if items must be safeguarded) (internal quotation marks omitted). The "possibility" of turning property over to a third party present at the scene of an arrest or at the stationhouse do not raise the risk that inventory searches will become a ruse for general rummaging.[5] If anything, the opposite is true. A practice of retaining police custody over property and not turning it over to willing third parties could potentially become a ruse for general rummaging.

The third Mendez requirement is met because the arresting officers would have inevitably found the gun in Morillo's backpack had they followed the inventory search guidelines and searched the backpack at the stationhouse. A backpack can be easily opened and the arresting officers can inventory and voucher its contents without risking damage to the bag. Nothing in the record suggests that Officer Finnegan or Lancer would not have readily found the gun following standard inventory search procedures. Finally, Officer Finnegan's testimony that he has invariably conducted an inventory search after each of his 85 career arrests establishes that such searches are "invariable" and "routine procedure" at his particular stationhouse. See Gorski, 852 F.2d at 696. The Government's evidence, therefore, satisfies the three Mendez requirements by a preponderance of the evidence. See 315 F.3d at 137; see also Nix, 467 U.S at 447.

---

[5] This court does not need to address whether conducting "preliminary inventory searches" at the scene of the arrest or searching any items given to a third party at the scene of an arrest are themselves valid inventory searches because the court finds that the gun is admissible under inevitable discovery in an inventory search at the stationhouse. See Mendez, 315 F.3d at 139.

18

In addition to finding the three <u>Mendez</u> requirements satisfied, the court may only apply the inevitable discovery doctrine if it finds, "with a high level of confidence, that each of the contingencies necessary to the legal discovery of the contested evidence would be resolved in the government's favor." <u>Heath</u> 455 F.3d 60. When the contingency is a police officer's discretionary decision the inquiry is whether the officer's decision was itself inevitable. <u>See</u> <u>id.</u> at 60-61 (applying the "high level of confidence" analysis to discretionary police decisions).

Officer Finnegan's testimony identified three contingencies between arresting Morillo and a valid inventory search at the stationhouse. The court must resolve, with a high level of confidence, (i) that the arresting officers would have brought Morillo's backpack to the stationhouse, rather than giving it to a third party at the scene of the arrest; (ii) that the officers would not have given the backpack to a third party at the stationhouse without entering it into inventory; and, (iii) because the police inventory search guidelines use permissive language, that the officers would have applied those guidelines and searched the backpack.[6]

The court finds with a "high level of confidence" that each of these three contingencies would be resolved in the Government's favor.[7] There was no third party at the scene to whom the officers could have given Morillo's backpack. Even if the officers did give the backpack to a third party at the stationhouse, Officer Finnegan credibly testified that his practice is to conduct an inventory search before returning property to that third party. Finally, Officer Finnegan

---

[6] Whether the officers would have arrested Morillo in similar circumstances is not a contingency in this analysis because the search occurred after the officers arrested Morillo. And a Judge's discretionary decision to issue a warrant is not at issue because an inventory search does not require a warrant.

[7] This court recognizes the semantic puzzle of applying the preponderance of the evidence standard to inevitable discovery. <u>See</u> <u>Heath</u>, 455 F.3d at 59 n.6. Like the Court of Appeals that previously identified this puzzle, this court does not need to resolve it. Officer Finnegan's testimony regarding his invariable practice over the course of 85 career arrests leaves little room for doubt that each of the three contingencies in this case would be resolved in the Government's favor.

credibly testified that he invariably performs inventory searches, notwithstanding any discretionary language in the Inventory Search Guidelines.

Accordingly, the gun is admissible because it would have been inevitably discovered in a valid inventory search.

### III. CONCLUSION

For the foregoing reasons this court accepts the Magistrate Judge's Report and Recommendation, as modified herein. Defendant's suppression Motion is denied.

SO ORDERED.

Dated: Brooklyn, New York
      October 9, 2009

       /s/ Nicholas G. Garaufis
NICHOLAS G. GARAUFIS
United States District Judge